UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ROBERT G. YASI, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 14-cv-10128-DJC |
| M/V HORIZON'S EDGE et al., | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

CASPER, J.                                                                                                          May 29, 2015

### I.     Introduction

Plaintiff Robert G. Yasi ("Plaintiff") has filed this lawsuit against Defendants M/V Horizon's Edge ("the Vessel") and Horizon's Edge Excursions, LLC ("HEE") seeking to foreclose on three promissory notes secured by mortgages on the Vessel. D. 1. HEE, David E. Groom, Jane Walker McKinney Trust 1973 ("JWMT") and 40 East Partnership, LLP, ("40 East") (collectively the "Claimants") have also submitted claims as mortgagees of the Vessel. D. 13; D. 15; D. 18; D. 26. Plaintiff has moved for summary judgment. D. 68. For the reasons stated below, the Court ALLOWS the motion.

### II.    Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it carries with it the potential to affect

1

the outcome of the suit under applicable law." Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000). The movant bears the burden of demonstrating the absence of a genuine issue of material fact. Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets its burden, the non-moving party may not rest on the allegations or denials in its pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but must come forward with specific admissible facts showing that there is a genuine issue for trial. Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

## III.  Factual Background

HEE was formed by five individuals, David Zion, Thomas Groom, Paul Yasi, John Yasi, and Daniel Carnevale (collectively the "Founding Members"). At all relevant times, HEE owned the Vessel, an excursion boat used for casino cruises. D. 70, Plaintiff's Statement of Material Facts ("PSMF") ¶ 7. The Founding Members also formed Horizon's Edge Casino Cruises ("HECC"), a management company that chartered the Vessel from HEE. Id. ¶ 1; D. 86, Claimants' Response to Plaintiff's Statement of Facts ("CRPSF") ¶ 8.

The Founding Members sought investments in the HEE from family members. Investors purchased shares in HEE for $120,000 each. D. 86, Claimants' Statement of Material Facts ("CSMF") at 9. Such investments made up 70% of the value of HEE, and the other 30% of HEE was owned by the Founding Members. Id. Plaintiff, brother of the Founding Members Paul and John Yasi, purchased six and a half shares of HEE. D. 70, PSMF ¶ 5; D. 86, CRPSF ¶ 6.

Plaintiff's funds for this investment came from his winnings from the California lottery. D. 70, PSMF ¶ 5. Claimant David Groom purchased one share. D. 86, CRPSF ¶ 6.

On March 31, 2004, Plaintiff loaned HEE $500,000. D. 86, CRPSF ¶ 11. On April 1, 2004, HEE executed a Promissory Note secured by a Second Preferred Ship Mortgage for the Vessel for the $500,000 loan. D. 70, PSMF ¶¶ 12-13. The First Preferred Ship's Mortgage ahead of Plaintiff's Second Preferred Ship Mortgage was held by Key Equipment Finance, Inc. ("Key Bank"). Id. ¶ 14. In the spring of 2005, Key Bank "called its loan" because HEE was unable to meet Key Bank's capital requirements. D. 86, CSMF at 9. HEE subsequently paid off Key Bank's mortgage. D. 70-1 at 14.

With Key Bank's funding withdrawn, HEE reached out to Plaintiff and David Groom for $1.6 million in financial assistance. D. 86, CSMF at 10. On April 5, 2005, HEE executed $800,000 Promissory Notes (drafted by Paul Yasi) to both Plaintiff and 40 East. D. 70, PSMF ¶ 16; D. 86, CSMF at 10. Both of these notes were secured with Preferred Ship Mortgages on the Vessel, which were recorded on December 22, 2005. D. 70, PSMF ¶ 17.

In 2005, there was disagreement among the Founding Members as to how HEE should proceed: Thomas Groom and David Zion wanted to expand casino cruise operations in Florida while Paul Yasi and John Yasi wanted to keep the business in Massachusetts. D. 70, PSMF ¶ 18. Thomas Groom, Andrew Triantafillou, David Groom and David Zion established T.A.D.D., LLC ("TADD"), a new entity that raised $2,000,000 to buy out membership interests in HEE. D. 86, CRPSF ¶¶ 21-22. Thomas Groom testified that the Yasi family and their friends wanted to be bought out of HEE, but TADD did not have enough money to buy out all of their shares. D. 86-5 at 3-4. Some HEE investors did not receive buyout offers from TADD. Id. at 5.

On September 8, 2005, TADD purchased 18.41 HEE shares held by Plaintiff's brothers Paul, John and Peter, Plaintiff's mother Beatrice, Plaintiff's sister Bonnie and several other members. D. 86, CSMF at 10. These shares were sold to TADD for $108,000 per share. Id. at 11. Plaintiff's brothers also signed release agreements with HEE and HECC and received management fees ranging from $30,332 (for Peter Yasi) to $106,167 (for Paul and John Yasi). Id. at 10. TADD purchased 3.5 of Plaintiff's 6.5 shares, but declined to purchase his three remaining shares. Id. at 11. Following the buyout of Plaintiff's brothers, Claimant David Groom became a managing member of HECC in November 2005. D. 86, CRPSF ¶ 25.

On September 9, 2005, Plaintiff and HEE executed an Agreement to Extend Note and Purchase Stock, D. 70-9 at 26, whereby Plaintiff agreed to extend the terms of his two promissory notes to HEE by twelve months and HEE agreed to purchase Plaintiff's remaining three shares in HEE for a total of $360,000 on April 8, 2007 at Plaintiff's option. The agreement required Plaintiff to give 60 days' notice and to deliver his stock certificates to HEE if he elected to exercise his option. Id. Plaintiff neither returned his stock certificates to HEE nor gave the required notice that he intended to sell his stock. D. 86, CSMF at 11; D. 86, CRPSF ¶¶ 27-29.

On March 1, 2007, HEE executed a $360,000 Promissory Note to purchase Plaintiff's stock. D. 70, PSMF ¶¶ 27-28. This note was secured with a Preferred Ship Mortgage dated May 8, 2007. Id. ¶ 29. At this time, the combined value of the mortgages on record on the Vessel was $2.36 million. D. 70-11 at 2-4. (The fair market value of the Vessel as of April 2008 was $7.3 million. D. 87-2 at 7). On March 1, 2007, HEE and Plaintiff executed an Allonge to the $500,000 Promissory Note extending payments to March 1, 2009. D. 70, PSMF ¶ 30. On May 1, 2007, HEE and Plaintiff executed an Allonge to the $800,000 Promissory Note extending payments to March 1, 2009. Id. ¶ 31.

4

By September 2007, HEE was behind on its payments to Plaintiff. D. 70, PSMF ¶ 33. Plaintiff sent a letter to HEE on September 12, 2007 threatening to foreclose and arrest the Vessel if HEE did not bring its payments current within 30 days. Id. ¶ 34; D. 86-1 at 77-80. David Zion testified that at that time, HEE did not have the wherewithal to meet its financial obligations. D. 86, CSMF at 13. Around that time, both 40 East and the JWMT were advancing large sums of money to HEE in an effort to sell HEE and HECC together. Id. In September 2007, the Vessel was regularly operating with 500 passengers onboard. Id.

On October 11, 2007, Plaintiff sent another letter to HEE, again threatening foreclosure and the arrest of the Vessel if loan payments owed to him were not brought current. D. 86, CSMF at 13; D. 86-9 at 16-18. For the next few months, Plaintiff and HEE engaged in discussions about the foreclosure of the loans and arrest of the Vessel. D. 86-9 at 6-9. By February 2008, according to David Zion, it was clear that HEE's operations were not going to be able to continue. D. 86, CSMF at 14; D. 86-1 at 13.

On February 12, 2008, HEE, 40 East and Plaintiff executed another agreement. Id. ¶¶ 35-36; D. 70-9 at 43-45. Plaintiff agreed not to foreclose upon the Vessel in exchange for 40 East's subordination of its $800,000 mortgage to all of Plaintiff's mortgages. D. 70-9 at 43-44. The February 12, 2008 agreement was signed by Plaintiff, Claimant David Groom and Glenn Bolduc, a consultant retained by David Groom to assist HEE and HECC. Id. at 44-45; D. 86, CRPSF ¶ 32.

Using funds provided by 40 East and the JWMT, HEE brought the interest payments owed to Plaintiff current as of May 2008. D. 70, PSMF ¶¶ 39-40; D. 86, CRPSF ¶¶ 39-40. After June 2008, HEE made only one partial interest payment. D. 70, PSMF ¶ 45. In April 2009,

HECC declared bankruptcy. Id. ¶ 42. In June 2012, the JWMT became the sole member of HEE. Id. ¶ 46.

## IV. Procedural History

On January 17, 2014, Plaintiff brought this action in rem against the Vessel, her engines, boilers, tackle and appurtenances, and in personam against HEE seeking to foreclose on his three Preferred Ship Mortgages. D. 1. The Vessel was arrested on January 24, 2014. D. 11. Following the arrest of the Vessel, Claimants HEE, 40 East, the JWMT and David Groom filed claims to protect their interests as mortgagees of the Vessel. HEE filed a claim as sole and bona fide owner of the Vessel. D. 13. 40 East filed a claim to the Vessel in the amount of $800,000. D. 15. David Groom filed a claim in the amount of $235,309.50. D. 18. The JWMT filed a claim in the amount of $7,438,707. D. 26. On May 30, 2014, Plaintiff moved for interlocutory sale of the Vessel. D. 47. This Court allowed Plaintiff's motion for an order of interlocutory sale, but required Plaintiff to post a bond of $800,000. D. 98. Plaintiff has now moved for summary judgment. D. 68. The Court heard the parties on the pending motion on March 31, 2015 and took this matter under advisement. D. 99.

## V. Discussion

This is a case about recovery on three promissory notes. There is no dispute that Plaintiff holds three promissory notes secured by Preferred Ship Mortgages against the Vessel. Under the Ship Mortgage Act, a preferred mortgage "has priority over all claims against the vessel (except for expenses and fees allowed by the court, costs imposed by the court, and preferred maritime liens)." 46 U.S.C. § 31326(b)(1). There is no dispute that HEE is in default on all three notes. The Claimants argue that there is a genuine issue of material fact as to the validity and priority of Plaintiff's mortgages due to Plaintiff's inequitable conduct, HEE's undercapitalization and

6

economic duress at the time of the September 9, 2005 Agreement to Extend Note and Purchase Stock. For the reasons discussed below, the Court finds that none of these arguments raises a genuine issue of material fact as to Plaintiff's entitlement to recover on his notes.

### A. **Inequitable Conduct**

The upshot of Claimants' inequitable conduct argument is that Plaintiff's mortgages should be recharacterized as equity or subject to equitable subordination to Claimants' mortgages because Plaintiff behaved inequitably by (1) receiving a partial buyout of 3.5 out of 6.5 shares of his initial investment in HEE at a time when HEE was in financial distress; (2) attempting to recoup the value of his remaining three shares while the Claimants tried to maintain the business; and (3) reaping a financial gain by delaying the inevitable demise of HEE after it became insolvent. D. 86 at 17-19.

"Equitable subordination" and "recharacterization," commonly associated with bankruptcy cases, are treated together here because the Claimants asserted them both in opposition to Plaintiff's motion. A loan or advance made by an investor to a company may, in certain circumstances, be treated as a capital contribution rather than as a loan. See In re AtlanticRancher, 279 B.R. 411, 433 (Bankr. D. Mass. 2002). If an advance is treated as a capital contribution instead of a loan, a claim for repayment of that advance will be subordinated to the claims of other creditors. See Yankee Microwave v. Petricca Commc'ns Sys., Inc., 53 Mass. App. Ct. 497, 523 (2002). Whether an advance should be treated as a capital contribution to, rather than creating a debt of, an entity depends upon the objective intent of the contributor[1] and whether, in the particular circumstances, equitable considerations require treatment of the advance as a capital contribution. Id. Under the doctrine of equitable subordination, a

---

[1] Claimants have not argued that Plaintiff intended the loans in question to be capital contributions.

bankruptcy court may subordinate a claim if 1) the claimant engaged in some kind of inequitable conduct; 2) the misconduct resulted in injury to other creditors or conferred an unfair advantage to the claimant; and 3) equitable subordination is not inconsistent with the provisions of the Bankruptcy Code. In re 604 Columbus Ave. Realty Trust, 968 F.2d 1332, 1353 (1st Cir. 1992) (citing In re Mobile Steel Co., 563 F.2d 692, 703 (5th Cir. 1977)). When the creditor is an insider, a court must rigorously scrutinize claims arising between the debtor and the creditor. Id. at 1360. The Court accepts the Claimants' argument that Plaintiff, as brother of two managers of HEE, was an insider of HEE. See 11 U.S.C. § 101(31)(B)(vi). However, drawing all inferences in the Claimants' favor as the non-movants, the record does not raise a disputed issue of fact as to whether Plaintiff's conduct was inequitable.

First, as to Plaintiff's partial buyout in 2005, the Claimants fail to support an argument for equitable relief. Claimants argue that Plaintiff "obtained loans from an insolvent and undercapitalized HEE in 2004 and 2005," D. 86 at 18, but the record shows that it was HEE that obtained loans from Plaintiff at this time, in the amounts of $500,000 in 2004 and $800,000 in 2005. On September 8, 2005, Plaintiff sold 3.5 of his 6.5 shares in HEE for $392,000 to TADD, an entity that had been formed by two of the Founding Members of HEE plus Andrew Triantafillou and Claimant David Groom for the purpose of buying up HEE interests. The Claimants emphasize that the Yasi family, including Plaintiff, received $891,000 from TADD in 2005, D. 86 at 17, but they offer no explanation as to why the fairness of this transaction as it relates to Plaintiff should be judged by the sale of shares by other members of his family. More importantly, the financial wherewithal of HEE at this time is not relevant to the fairness of Plaintiff's conduct in accepting this partial buyout, as it was TADD – a separate entity from HEE – that paid him for these shares.

Next, Claimants challenge Plaintiff's use of "legal maneuvers" since 2006 to recoup his three remaining shares in HEE while the Claimants continued to maintain the Vessel in an effort to get a return on their investments. D. 86 at 18. It is undisputed that Plaintiff threatened to foreclose and arrest the Vessel in 2007, at a time when the Vessel was still regularly operating casino cruises carrying hundreds of customers. It, however, is also undisputed that HEE had defaulted on its loans to Plaintiff and that, upon such default, Plaintiff had the right to arrest the Vessel for recovery on his notes. The Claimants' decision to continue investing money in HEE and HECC's operations during a period of financial distress for HEE does not render inequitable Plaintiff's lawful conduct in threatening foreclosure.

Finally, the Claimants argue that "a mortgagee's continued dealings with an insolvent mortgagor and reaping a financial gain by delaying the inevitable demise of that insolvent mortgagor is inequitable conduct on the part of the mortgagee." D. 86 at 19 (citing Grant Gilmore, Jr. & Charles L. Black, The Law of Admiralty § 9-83 (2d ed. 1975)). Under the Claimants' theory, if Plaintiff knew that HEE was insolvent and also knew that HEE stood to incur large bills that it would be unable to repay in the ordinary course of business, Plaintiff should lose the priority of his mortgages for allowing HEE's operations to continue. Id. The Claimants, however, cite no support in the record for the proposition that Plaintiff intentionally "delayed the inevitable demise" of HEE or that he reaped any financial gain from HEE's continued operation after it became financially distressed. On balance, the Court finds no support in the record for the Claimants' arguments that Plaintiff misused his position to the disadvantage of other creditors or otherwise behaved in a manner that justifies the equitable relief they seek.

B. <u>**Undercapitalization**</u>

Claimants argue that HEE was undercapitalized in 2004 and 2005, so Plaintiff's loans to HEE at that time should be treated as capital contributions or equitably subordinated. D. 86 at 19-22. "[S]o-called loans or advances by the dominant or controlling stockholder will be subordinated to claims of other creditors and thus treated in effect as capital contributions by the stockholder . . . where the paid-in capital is purely nominal, the capital necessary for the scope and magnitude of the operations of the company being furnished by the stockholder as a loan." Pepper v. Litton, 308 U.S. 295, 309-10 (1939). Capitalization is inadequate if "in the opinion of a skilled financial analyst, it would definitely be insufficient to support a business of the size and nature of the bankrupt in light of the circumstances existing at the time the bankrupt was capitalized" or if "at the time when the advances were made, the bankrupt could not have borrowed a similar amount of money from an informed outside source." In re 1236 Dev. Corp., 188 B.R. 75, 82 (Bankr. D. Mass. 1995) (quoting In re Mobile Steel Co., 563 F.2d 692, 703 (5th Cir. 1977)). Claimants do not offer an opinion of a skilled financial analyst and instead argue that the second undercapitalization standard is satisfied here. D. 86 at 21.

Claimants cite the following facts in support of their undercapitalization argument. First, Plaintiff initially owned 6.5 shares in HEE for a total initial investment of $780,000, and the Yasi family was HEE's largest investor in 2004. D. 86-1 at 87; D. 86-7 at 12. Second, HEE endured a net income loss of $2,022,134 in 2004, reducing its investors' total equity from $3,530,318 to $1,508,184.[2] D. 86-8 at 5. Third, in 2005, Key Bank called its mortgage because HEE failed to

---

[2] Plaintiff has moved to strike the affidavit of Claimant David Groom to which Claimants appended HEE's 2004-2006 balance sheets. D. 88 (moving to strike D. 86-8). In his affidavit, David Groom states that he is the President of the Trustees of the JWMT (the sole remaining member of HEE as of 2012) and "[u]pon information and belief, the documents attached hereto . . . are true and accurate copies of HEE's final balance sheets for 2004, 2005 and 2006, which

10

meet Key Bank's capital requirements. Finally, Claimants argue that Plaintiff must have known about HEE's distressed financial condition because TADD was buying out HEE shares only a few months after HEE received funding from Plaintiff and 40 East to pay off Key Bank's loan. D. 86 at 22.

The Claimants fail to raise a disputed issue of material fact as to whether Plaintiff's mortgages should be recharacterized or equitably subordinated due to HEE's alleged undercapitalization. The fact that HEE incurred a net income loss and a reduction in investor's equity in 2004 does not mean that HEE was undercapitalized. Claimants have cited no evidence that HEE was unable to obtain financing from outside lenders at the time Plaintiff made his loans. The closest evidence in the record pertains to Key Bank's divestment from HEE in 2005. Paul Yasi testified that Key Bank financed HEE prior to 2005. D. 86-3 at 3. He further explained that HEE was never late on a payment, but, after two or three years, Key Bank did not want HEE in its portfolio so it decided to call the loan. Id. at 4. At that time, HEE was maintaining $800,000 in its account with Key Bank, but Key Bank required them to keep a balance of $1,000,000. Id. at 3-4. Paul Yasi testified that after Key Bank called its loan, HEE was "looking for a bank finance [sic] at that time, and the rates were generally a lot higher at that time for commercial rates, and especially for vessels . . . . My best memory is we thought we'd

---

were provided to HEE by its accountant, Michael J. Apone. . . ." D. 86-8 at 1. Under Rule 56, affidavits may be offered in support of or opposition to summary judgment if they set forth facts that would be admissible in evidence. Fed. R. Civ. P. 56(c). Plaintiff argues that the affidavit is inadmissible because it is an expert or lay opinion as to HEE's financial condition, the balance sheets are "incomplete and unverified," and the balance sheets are inadmissible hearsay. The Court rejects these arguments and declines to strike the affidavit or its attachments. First, HEE's balance sheets are not an opinion, and to the extent that Claimants rely on the balance sheets themselves and not opinions regarding same, they are entitled to do so to as evidence of the financial condition of HEE during the years in question. Second, as to the authenticity of the balance sheets, David Groom on behalf of HEE has attested that the balance sheets are the documents that he obtained from Apone, HEE's accountant. Finally, the balance sheets appear to fall into the hearsay exception for business records. Fed. R. Evid. 803(6).

reach out to my brother [Plaintiff] and Tom's brother [Claimant David Groom] and see if they were interested in splitting a note." Id. at 4. The record shows that a loan from Plaintiff or Claimant David Groom was attractive to HEE because it offered lower rates than those available commercially, but there is no evidence that outside financing was unavailable.

### C. Duress

Finally, the Claimants argue that the September 9, 2005 Agreement to Extend Note and Purchase Stock is voidable due to economic duress. D. 86 at 22. The elements of economic duress are: "(1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party." Int'l Underwater Contractors, Inc. v. New England Tel. & Tel. Co., 8 Mass. App. Ct. 340, 342 (1979) (citing Urban Plumbing & Heating Co. v. United States, 408 F.2d 382, 389 (Cl. Ct. 1969) (internal quotation omitted)). "Merely taking advantage of another's financial difficulty is not duress. Rather, the person alleging financial difficulty must allege that it was contributed to or caused by the one accused of coercion." Id. (quoting Williston, Contracts § 1617 at 708 (3d ed. 1970)). "[I]n order to substantiate the allegation of economic duress or business compulsion . . . [t]here must be a showing of acts on the part of the [Plaintiff] which produced [the financial embarrassment]. The assertion of duress must be proved by evidence that the duress resulted from [Plaintiff's] wrongful and oppressive conduct and not by [Claimant's] necessities." Id. (citing W. R. Grimshaw Co. v. Nevil C. Withrow Co., 248 F.2d 896, 904 (8th Cir. 1957)).

The Claimants argue that the following facts support their duress argument. Paul Yasi drafted the Agreement to Extend Note and Purchase Stock on behalf of Plaintiff at a time when it was clear that HEE would not be able to afford to buy out all of the investors seeking to divest

12

from HEE. D. 86 at 23-24. The Agreement was executed on the same date that Plaintiff's brothers sold their HEE shares to TADD. Pursuant to the Agreement, Plaintiff was given a valuation of his shares at $120,000 each, which was $12,000 higher per share than the valuation given by TADD. In 2005, HEE continued to record a net operating loss and a reduction of partners' capital and total equity. D. 86-8 at 7. According to the Claimants, HEE had no choice but to enter the Agreement because "[o]ther alternatives . . . risked the continuing viability of HEE and the remaining investors' hopes of a return on their investments." D. 86 at 24-25. While the Claimants cite evidence that HEE was experiencing financial difficulty, Claimants fail to present any specific, admissible evidence that Plaintiff "contributed to or caused" HEE's underlying financial distress as would be required for them to void the contract on the grounds of economic duress.

The Claimants also argue that Plaintiff used "coercive tactics" when he converted his remaining three HEE shares into a promissory note and subsequently threatened to foreclose and arrest the Vessel at a time when it was still in regular operation. D. 86 at 25. The Claimants fail to specify what these allegedly coercive tactics were, beyond Plaintiff's threats to foreclose on his mortgages after HEE's defaults. In exchange for Plaintiff's agreement to extend the terms of his two prior promissory notes, HEE promised in the Agreement to Extend Note and Purchase Stock that Plaintiff would be given the option of converting his remaining three HEE shares into a $360,000 promissory note in April 2007. The fact that his shares were valued at $12,000 more than the shares sold by investors in the 2005 TADD buyout is neither a sign of inequitable conduct nor duress – HEE received consideration for this additional value in the form of extensions on its existing notes and a delay of almost two years before Plaintiff was permitted to exercise the option to convert his shares into a promissory note.

13

D.  **Amount of Interest**

The $500,000 and $800,000 notes provide that "[a]ll amounts in arrears [are] to bear interest at the rate of 1.5% percent per month until finally paid." D. 70-9 at 2-3, 21-22. The interest rate for the $360,000 note is eight percent. D. 70-9 at 27. As of September 1, 2014, the combined principle and interest amount owed under these three notes by HEE to Plaintiff is $3,311,950. D. 70-13 at 3.

The Claimants ask the Court to disregard these interest rates on the grounds that the rates stated in the promissory notes (drafted by Paul Yasi) are exorbitant and Plaintiff delayed seeking default for an inordinate amount of time, thereby causing Claimants to incur maintenance costs in excess of $700,000. D. 86 at 26-27. The rate of prejudgment interest in contract cases is determined by the law of the state where the court is located. See Joseph v. J.P. Yachts, LLC, 436 F. Supp. 2d 254, 273-74 (D. Mass. 2006). In Massachusetts, the relevant statute provides for prejudgment interest "at the contract rate, if established, or at the rate of twelve per cent per annum from the date of the breach or demand." Mass. Gen. L. c. 231, § 6C. "Under maritime law, the awarding of prejudgment interest is the rule rather than the exception, and, in practice, is well-nigh automatic." Reeled Tubing, Inc. v. M/V Chad G, 794 F.2d 1026, 1028 (5th Cir. 1986). Typical examples of the "peculiar circumstances" that would justify a district court exercising its discretion to deny prejudgment interest are "an unwarranted delay in bringing suit, a damages award substantially less than that sought, a genuine dispute regarding liability, complex legal and factual issues, and a bad faith claim." U.S. Fire Ins. Co. v. Allied Towing Corp., 966 F.2d 820, 828 n.14 (4th Cir. 1992).

The Court finds neither of the Claimants' arguments to be persuasive grounds to disregard the interest rates set forth in the notes. The Claimants have presented no evidence that

14

the interest rates are unreasonable under the circumstances. As for Plaintiff's delay in bringing suit after HEE's default in 2008, the Claimants themselves note that this delay occurred while "Paul Yasi and David Groom were working cooperatively to sell the Vessel," D. 86 at 27, so the Court finds no basis to conclude that the delay was unjustified or motivated by bad faith. Furthermore, the Court finds no other "peculiar circumstances" that would justify denying or reducing the prejudgment interest owed to Plaintiff.

## VI. Conclusion

For the foregoing reasons, the Court ALLOWS Plaintiff's motion for summary judgment, D. 68, and DENIES Plaintiff's motion to strike, D. 88.

**So Ordered.**

                                                /s/ Denise J. Casper
                                                United States District Judge